**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHRISTOBAL A. LOPATEGUI-PAOLI,

Defendant.

CRIMINAL NO. 22-515 (RAM)(HRV)

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**INTRODUCTION**

Pending before the Court is "Defendant's Motion to Suppress and Motion to Dismiss" (Docket No. 54) and the "Motion to Supplement Motion to Suppress Evidence Filed in Docket No. 54" (Docket No. 83) both filed by defendant Christobal Alejandro Lopategui-Paoli (hereinafter "Mr. Lopategui"). The United States has opposed both motions. (Docket Nos. 66 and 90). The motions were referred to me for report and recommendation. (Docket Nos. 63 and 85). I held evidentiary hearings on February 8 and March 14, 2024. (Docket Nos. 84 and 91). For the reasons set forth below, I recommend that both motions be DENIED.

**PROCEDURAL BACKGROUND**

***The Charges***

On December 1, 2022, a grand jury sitting in this district returned an Indictment charging Mr. Lopategui in five counts. (Docket No. 11). Count one charges possession of

a machinegun in furtherance of a drug trafficking crime, a violation of 18 U.S.C. § 924(c)(1)(B)(ii). (*Id*.) Count two alleges that defendant possessed firearms in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (*Id*.)  Count three charges Mr. Lopategui with the offense of knowing possession of a machine in violation of 18 U.S.C. § 922(o). (*Id*.)  Counts four and five allege that defendant possessed with intent to distribute cocaine and methamphetamine in violation of 21 U.S.C. § 841(a). (*Id*.)  These charges arose out of a Puerto Rico Police Bureau ("PRPB") intervention that took place on November 18, 2022.  The controlled substances and firearms that form the basis of the charges in the indictment were discovered by the police inside a vehicle that Mr. Lopategui was driving that morning.

### *The Original Motion to Suppress*

On September 25, 2023, Mr. Lopategui moved to suppress the fruits of what he claims was an unconstitutional seizure of his person and search of the vehicle he was driving. (Docket No. 54).  He also requested dismissal the indictment arguing that exculpatory evidence was allegedly destroyed.  The crux of his argument is that without reasonable suspicion or probable cause, the PRPB officers unjustifiably extended the scope and duration of the initial, and concededly lawful, traffic stop.  Lopategui further argues that there was no reasonable articulable suspicion to support his continued detention for investigatory purposes after traffic tickets had been issued, and the mission and purpose of the traffic stop had been accomplished.  According to the defendant, the agents' actions, including calling for a K9 unit to arrive at the scene, prolonged the intervention beyond what is tolerable under the Fourth Amendment.  Mr. Lopategui also

makes a general spoliation argument related to the alleged failure by the government to preserve body camera footage of the intervention.

### *The United States' Response*

The United States filed a response in opposition to the defendant's original motion to suppress on November 30, 2023. (Docket No. 66).  In it, the government first argues that defendant lacks standing because Mr. Lopategui has not met his burden of demonstrating he had a reasonable expectation of privacy in the car.  With respect to the merits, the government contends that the traffic stop was justified at its inception given the numerous traffic violations observed. The extension of the intervention was also justified, according to the government, because the facts that developed from the lawful stop raised reasonable suspicion allowing the agent to "increase the scope" of her investigation.  In this case, the agent detected the odor of marijuana emanating from the car, which supported the calling of a K9. Further, the intervention evolved from reasonable suspicion to probable cause when the defendant opened the passenger door of the car to reveal spent shell casings.

In sum, the government maintains that the initial stop was legal, the additional facts that developed permitted the agent to continue investigating, and once cause to arrest arose, a search incident to said arrest was justified.  The officers, however, sealed the vehicle and obtained a search warrant. The subsequent search uncovered the contraband that resulted in Mr. Lopategui being federally charged.  Lastly, the government argues that the claim of spoliation should be denied because the defendant has failed to sufficiently establish that the alleged missing evidence was exculpatory or that any failure to preserve was done in bad faith.

***Standing hearing and Supplemental motion under Franks v. Delaware***

At the request of the government (Docket No. 74), I scheduled a bifurcated hearing to consider the threshold question of standing.  One day before the hearing, on February 7, 2024, the defendant filed a motion titled "Motion to Supplement Motion to Suppress Evidence Filed in [sic] Docket No. 54." (Docket No. 83).  In said motion, Mr. Lopategui requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).[1]  He claimed in essence that the affidavit submitted by PRPB agent Melody Mejia-Boden (hereinafter "agent Mejia") to a state magistrate in her application for a search warrant contains falsehoods without which the local judge would not have found probable cause.  More specifically, it is argued that the version of facts in her affidavit "is at odds with what objectively occurred and was captured on video" in the body cam footage. (Docket No. 83 at 4).

On February 8, 2024, I made a finding that the supplemental motion was really a new dispositive motion that (1) had not been referred to me at that time; and (2) the defense had not complied with the deadline imposed by the Presiding Judge for the filing of pre-trial motions.  The hearing was thus limited to the issue of standing raised by the government. (Docket No. 84).  The defense presented no evidence, only argument.  After listening to the parties, I held that the defendant only had standing to challenge the

---

[1] A *Franks* hearing . . . is primarily a vehicle for challenging a warrant by impeaching the affiant. *United States v. Adams*, 305 F.3d 30, 36 n.3 (1st Cir. 2002).

4

constitutionality of the traffic stop, and scheduled an evidentiary hearing which was held on March 14, 2024. (Docket No. 91).

### *The Evidentiary Hearing and Post-Hearing Briefing*

On March 14, 2024, at the start of the hearing, I again defined its scope making a finding for the record that the hearing was limited to the traffic stop.  I reiterated my previous finding that the defendant had failed to meet his burden of establishing standing to challenge the search of the vehicle. I then heard the testimonies of PRPB agent Melody Mejia-Boden and Homeland Security Investigations (HSI) Task Force Officer Alexander Tirado-Diaz (hereinafter "TFO Tirado") on behalf of the government. The defense offered the testimonies of Abraham Freire-Medina, Esq., PRPB agent Eliezer Gomez-Rosa and PRPB agent Luis Rivera-Rivera (hereinafter "agent Rivera-Rivera").  I also admitted several exhibits into evidence. (Docket Nos. 92 & 93).

The parties requested an opportunity to submit post-hearing memoranda after receiving the transcript of the evidentiary hearing. I granted the request for simultaneous briefing.  The parties submitted their respective memorandums on May 1, 2024. (Docket Nos. 98 and 99).

### FINDINGS OF FACT

With the benefit of the parties' pre-hearing written submissions, the documentary and testimonial evidence received at the hearing, and the parties' post-hearing memoranda, I now make the following findings of fact. Unless otherwise noted, these facts are not in controversy.

***The Initial Intervention***

On November 18, 2022, agent Mejia conducted a traffic stop of a vehicle driven by Mr. Lopategui on Highway 22 at approximately kilometer 3.3, in San Juan, for speeding and illegal lane changes, violations of Puerto Rico Act 22. (Transcript of Suppression Hearing, ("Tr.") Docket No. 97 at 8-9). Agent Mejia testified that Mr. Lopategui was driving at a speed of 74 miles per hour, in a zone where the speed limit was 55 miles per hour. (Tr. 9). The vehicle driven by Mr. Lopategui was a black 2019 Dodge Charger. (*Id*.).   It was approximately 9:20 a.m. when she pulled the Dodge Charger over. (*Id*.). Agent Mejia identified the specific area where she stopped Mr. Lopategui's car in exhibit ("Ex.") 1. (Tr. 11-13; Ex. 1-A).

Agent Mejia stepped out of the patrol car, which was parked behind the Dodge Charger, and approached the stopped vehicle from the driver's side. (Tr.14).  She could not remember when she notified radio control of her intervention. (Tr. 52).  In fact, she admitted on cross examination that she normally does not notify radio control or the license plate of the vehicle unless the intervention is going beyond a traffic ticket. (*Id*.). Even though police procedure requires notifying command center in every vehicle intervention, Agent Mejia admitted on cross examination that she "normally" does not comply with said rule. (Tr. 53).

Immediately upon approaching, agent Mejia noticed that there was a police cap on the back of the vehicle. (Tr. 14-15). As she reached the driver area, Mr. Lopategui lowered the window halfway. (Tr.15).  Agent Mejia "noticed a strong smell of marijuana that came from the interior of the vehicle." (*Id*.).  This is one of the central facts in dispute. She also observed a small black purse on the passenger's side seat.  (Tr. 59).  Agent Mejia

6

does not remember asking Mr. Lopategui if he had a medicinal marijuana permit. (Tr. 60). She also, "at no point" asked defendant to open the purse. (*Id.*).

Agent Mejia greeted Mr. Lopategui, explained the reason for the stop, and requested the pertinent documentation. *Id.* Mr. Lopategui informed agent Mejia that he did not have his driver's license on him nor the vehicle's documentation. *Id.* She also asked him if he had a permit for the tinted windows. (Tr. 16). When Mr. Lopategui answered that he did not, Agent Mejia measured the windows yielding a 14 percent, which is in violation of Puerto Rico law. (*Id.*).

To corroborate his identity, Mr. Lopategui provided his social security number to the agent. (*Id.*). By inputting the social security number in an "electronic ticketing machine", Agent Mejia was able to corroborate that Mr. Lopategui has a driver's license, but that said license expired in 2019. (*Id.*; Tr. 56). She also entered the license plate number in the ticketing machine, and it came back as a Dodge Charger "from the car rental place Avis." (Tr. 59). In addition, agent Mejia allegedly told Mr. Lopategui that she perceived a smell of marijuana, (*id.*), something that Mr. Lopategui denies. At that moment, agent Mejia explained to Mr. Lopategui the process of requesting a search warrant, which included calling for a K9. (*Id.*). If the K9 alerted to the presence of narcotics, then the car would be sealed, and a search warrant requested. (Tr. 16-17). She also told Mr. Lopategui that he could consent to a search. (Tr.17). Mr. Lopategui refused to give consent. (*Id.*).

Agent Mejia then asked her partner, agent Rivera-Rivera, to call for a police K9. (*Id.*). She requested that it be a drug-detection K9 after telling Rivera-Rivera that she had smelled a strong odor of marijuana. (Tr. 62). Agent Rivera-Rivera called for a K9 at

9:23 a.m. (Tr. 151). While waiting for the K9, agent Mejia remained posted between the driver's door and the back driver's side passenger door. (*Id.*).  Within approximately three minutes of the intervention, Mr. Lopategui made phone calls, one of which was to someone who according to agent Mejia identified himself as an attorney. (Tr. 17-18).  At the request of Mr. Lopategui, agent Mejia spoke briefly with the attorney on speaker phone. (Tr. 17).  She again explained the procedure for requesting a search warrant.  (*Id.*). The attorney allegedly requested that the agent "give Mr. Lopategui a break," (*id.*), a fact disputed by the defense, and denied by defense witness Abraham Freire-Medina. (Tr. 122). The interaction between agent Mejia and the attorney lasted according to her "[l]ess than a minute."  (Tr. 18).

### *The Police Hat*

Upon being questioned about the police hat, agent Mejia testified that her initial reaction was that she was dealing with a fellow police officer taking into account the fact that a black Dodge Charger is compatible with police department patrol vehicles. (*Id.*). Agent Mejia further testified that when asked, Mr. Lopategui replied that he had no knowledge about the hat. (Tr. -18-19).  The agent then called in through radio the badge number on the hat to try to locate the fellow officer to whom it belonged. (Tr. 19).  It was important to her to know this information "to determine if the cap had been lost or stolen, what it had been used for, that it was not with the officer [it] belong[s] to." (*Id.*).  Agent Mejia found it problematic for someone who is not a police officer to have a police hat since robberies are being committed by people dressed as police officers, more so considering that the hat was found in a vehicle that is similar to vehicles used by the

police.  (Tr. 19-20).   Agent Mejia learned from dispatch that the fellow officer had reported his cap as lost. (Tr. 19).

### *Agent Mejia Issues Traffick Tickets*

Once several additional officers arrived at the scene, including a supervisor, Agent Mejia began issuing traffic tickets. (Tr. 18).  She issued seven (7) tickets in total. (Docket No. 92-1, Ex. 2).   The tickets were for speeding; driving between lanes; not using turn signals; not keeping a safe distance between vehicles; window tints in a percentage less than 35%; not having his driver's license on him while driving; and driving without registration documents. (*Id.*).   The first ticket was issued at 9:20 a.m. (Tr. 22; *see also* Docket No. 92-1 at 13). The second ticket was issued at 9:21 a.m. (*Id.* at 14). The third at 9:23 a.m. (*Id.* at 15).  The fourth ticket was also issued at 9:23 a.m. (*Id.* at 16). The fifth ticket was issued at 9:24 a.m. (*Id.* at 17). There is a gap of time between the first five tickets and the last two. The sixth ticket was issued at 9:32 a.m. (*Id.* at 19).  The last ticket was issued at 9:33 a.m. (*Id.* at 20).

On cross examination, agent Mejia explained that she was in no rush to finish issuing the tickets because she was waiting for the K9 to arrive. (Tr. 64).  Moreover, the agent also stated that had it not being for the marijuana smell, the intervention would have concluded with the issuance of the tickets—"that would have been the end of it." (Tr. 64). She further admitted on cross examination that even though she marked in the speeding ticket—the one issued at 9:20 a.m.—that Mr. Lopategui saw the radar, this had

1  not happened at that time. (Tr. 71).  Mr. Lopategui stepped out of the vehicle for the first
2  time after 9:33 a.m. (*Id.*).  He was arrested shortly thereafter.[2]

### *Mr. Lopategui's Refusal to Consent to the Search*

Agent Mejia asked Mr. Lopategui to voluntarily consent to a search of the vehicle,
after she allegedly smelled marihuana. (Tr. 43).  Defendant refused to consent. (*Id.*). In
her training and experience, having conducted thousands of traffic stops, when a person
has a small amount of marijuana or a cigarette, they usually consent to a search. (Tr. 48).
Lopategui's refusal to consent caused agent Mejia "to become more alert." (*Id.*).

### *Cellphone Location Evidence*

Incident to the arrest, the police seized Mr. Lopategui's phone. The government
introduced the phone into evidence as Exhibit 3. TFO Tirado testified that he analyzed
the phone. (Tr. 85-86).  Relevantly, he performed a review of location data. (*Id.*).  Exhibit
4 was then admitted into evidence. It contains a list of locations extracted from the phone.
(Tr. 86).  The selected locations listed were "native locations" meaning they were created
by the phone itself. (Tr. 91). The locations translate into coordinates (longitude and
latitude) reflecting the geographic area where the phone was at a given time. (Tr. 92).
These locations were then depicted in maps that comprise government's exhibits 5 to 11.
(Tr. 94). The relevant analysis was done selecting locations that began at 9:03 a.m. on
November 18, 2022, and ended at 9:39 a.m. (Ex. 4).

---

[2] Although no direct evidence was presented at the evidentiary hearing, it appears that the arrest was based
on the fact that Mr. Lopategui went to open the passenger side door of the vehicle at which time agents
were able to observe in plain view spent shell casings on the floorboard of the car. (Complaint, Docket No.
1; Government's response in opposition to motion to suppress, Docket No. 66 at 13).  The defense does not
seem to contest this.

A comparison between exhibits 1 and 1A, which are maps agent Mejia testified are of the area where the traffic stop occurred, and exhibits 5 to 11, the phone location maps, show that at 9:13 a.m. the coordinates place the phone near the area were agent Mejia testified she observed the traffic violations. (Ex. 9, Docket No. 92-1 at 30). At 9:19 a.m. the phone was signaling in the same general area[3] of the traffic stop. (*See* Ex. 10 and 10-A, Docket No. 92-1 at 31-32), and remained there without moving until 9:39 a.m. (Ex. 11, Docket No. 92-1 at 33). Based on the above, it is fair to conclude that the traffic stop occurred sometime between 9:13 a.m. and 9:19 a.m.

### *Attorney Freire-Medina Talks to Agent Mejia*

Attorney Abraham Freire-Medina was called by the defense and testified that on November 18, 2022, he received a phone call from Mr. Lopategui. (Tr. 120). During the call, he spoke to officer Mejia. (*Id.*). According to Attorney Freire, agent Mejia communicated to him that the reason for the continued detention of Lopategui was because she wanted him to open the black purse. (Tr. 120-21). Agent Mejia never mentioned to Attorney Freire-Medina in the conversation that she perceived a strong odor of marijuana. (Tr. 121).

### *Radio Communications on November 18, 2022*

The defense called to the stand PRPB agent Eliezer Gomez-Rosa. (Tr. 128). He was subpoenaed to testify and to bring with him recordings of the police radio communications relevant to the November 18, 2022, intervention with Mr. Lopategui.

---

[3] TFO Tirado testified that the coordinates have just a margin of error of five (5) to eight (8) meters. (Tr. 93).

11

The CD containing the recordings was admitted into evidence as defense's Exhibit A. (Tr. 135; Docket No. 93). He was asked to bring radio communications with dispatch between 8:50 a.m. and 10:00 a.m. (Tr. 143). Agent Gomez-Rosa also testified about the format in which police radio communications are recorded. The system identifies the channel, the date, and the time of the communication. (Tr. 142). There is a margin of error with respect to the times of the communications, but Agent Gomez-Rosa was not able to say what that margin of error was. (Tr. 144).

### Agent Luis Rivera-Rivera

Agent Rivera-Rivera testified that he recalls the intervention with Mr. Lopategui occurred sometime between 9:00 a.m. and 9:30 a.m. (Tr. 148). When asked at what time he called for a K9, he needed to refresh his recollection by listening to the radio communications in Exhibit A. (Tr. 148-151). After refreshing his memory, Agent Rivera-Rivera testified that it was at 9:23 a.m. (Tr. 151). The basis for requesting a K9 was according to agent Rivera-Rivera that he observed two bullet casings in the passenger side area. (Tr. 153). However, he requested a controlled substances K9. (*Id.*). Agent Rivera-Rivera did not "smell anything at that point." (*Id.*).

On cross examination, the government asked agent Rivera-Rivera how many stops approximately he would conduct in a day when he was in the highway patrol unit. He answered "30 to 35 per day" between vehicles and trucks. (Tr. 156). The government confronted agent Rivera-Rivera with the fact that he had trouble remembering the specific times during the intervention. He did remember that Lopategui was stopped for speeding. He also remembered, mistakenly as it turned out, that Lopategui produced a valid (not expired) driver's license in card form at the time of the intervention. (Tr. 158).

Agent Rivera-Rivera specifically said with respect to the driver's license "when I observed it, I believe it was valid, that it was current." (Tr. 161).  And when confronted with the fact that a ticket was issued for not having a driver's license, agent Rivera-Rivera stated "I didn't have that knowledge. I was in the back part giving cover." (Tr. 162).

Agent Rivera-Rivera candidly admitted that "it is possible [he was] just making an honest mistake given [that he does] so many car stops." (Tr. 164). He reaffirmed that he did not smell marijuana but knows that a large quantity of marijuana was later found in the car. (Tr. 166).  The government introduced into evidence Exhibit 13, a photograph displaying what was found in the car, including the marijuana and a blunt cigarette.  (Tr. 170-71; Docket No. 92-1 at 34). On redirect, agent Rivera-Rivera testified that the marijuana depicted in Ex. 13, was not found as displayed.  It was found in the trunk inside a bag. (Tr. 172). Agent Rivera-Rivera insisted that he does not remember smelling marijuana. (*Id*.). But on re-cross he testified that the quantity of marijuana found "could emit a strong odor." (Tr. 175).

## APPLICABLE LAW AND DISCUSSION

### *Standing*

When moving to suppress evidence, a defendant "carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized." *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008)(*citing United States v. Salvucci*, 448 U.S. 83, 91-92, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)). This threshold standing requirement is something that a defendant must establish before the court engages in any substantive Fourth Amendment analysis. *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994). To carry this burden,

> a defendant must demonstrate that he personally has
> an expectation of privacy in the place searched, and that his
> expectation is reasonable; i.e., one that has a source outside of
> the Fourth Amendment, either by reference to concepts of real
> or personal property law or to understandings that are
> recognized and permitted by society.

*United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005)(*quoting Minnesota v. Carter*, 525 U.S. 83, 88. 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998)).

   Put differently, the court must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such" and "whether the individual's expectation of confidentiality was justifiable under the circumstances." *United States v. Aguirre*, 839 F.3d 854, 857 (1st Cir. 1988). The following factors are relevant to the inquiry: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; [and] the totality of the surrounding circumstances." *Id.* at 856-57; *see also United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014)("In the context of a vehicle search, a defendant must show 'a property [or] possessory interest in the automobile' in order to establish a reasonable expectation of privacy.")

   Mr. Lopategui did not present any evidence to show that he was in lawful possession and control of the Dodge Charger. It is undisputed that the vehicle at issue in this case was a rental. This was corroborated by agent Mejia when she ran the license plate in the system. (Tr. 59)  Lopategui has also affirmed that the reason he did not have the vehicle's registration was because it was a rental. (*See* Docket No. 83-1). It should be noted that in the right set of circumstances, the unauthorized driver of a rental car can have a reasonable expectation of privacy for Fourth Amendment standing purposes. *See*

14

*Byrd v. United States*, 584 U.S. 395, 138 S. Ct. 1518, 200 L. Ed. 2d 805 (2018)(holding that "someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver.") But here, aside from the fact that the defendant was driving a car that happened to be a rental, there is no other information regarding whether the vehicle was rented to him or whether he was authorized to drive it as per the rental agreement. Similarly, there was no evidence introduced as to how Lopategui came to be in possession of the vehicle. For instance, no evidence was presented that the person who rented the car, assuming it was not him, gave permission to Lopategui to drive it. The record is devoid of any evidence that would allow me to find that he was in lawful possession and control of the car and, thus, had a legitimate expectation of privacy.

As I noted at the start of the March 14 evidentiary hearing, Mr. Lopategui had several opportunities to prove he has standing. (Tr. 5). He could have proffered evidence that he had a reasonable expectation of privacy when he initially filed his motion to suppress. Later, when the government raised the issue of lack of standing, I gave him an opportunity to reply specifically addressing the issue. (Docket No. 67). Lopategui limited himself to argue standing to challenge the lawfulness of the traffic stop. (Docket No. 72). In his supplemental motion to suppress under *Franks v. Delaware*, there was no attempt by Mr. Lopategui to establish that he had a legitimate expectation of privacy in the car. A hearing was even held for the sole purpose of addressing the threshold question of standing. The defense did not present any evidence. Accordingly, I find that Mr. Lopategui failed to carry his burden to show that he had a legitimate expectation of privacy in the Dodge Charger. *See United States v. Daniels*, 41 F.4th 412, 415-416 (4th

Cir. 2022)(affirming the denial of a motion to suppress where the defendant, uncannily similar to this case, failed to offer any evidence to meet his burden of establishing a legitimate expectation of privacy in a rental Dodge Charger.).

Notwithstanding, Lopategui has standing to challenge the lawfulness of the traffic stop conducted by the PRPB officers. In *United States v. Stark*, 769 F.3d 83 (1st Cir. 2014), the First Circuit reversed the denial of a motion to suppress on standing grounds. The district court had ruled that Stark lacked standing to challenge the traffic stop and the search of the vehicle that ensued after he was detained, because he was unlicensed, the car was a rental, and he was not authorized to drive it. *Id.* at 89. The First Circuit disagreed, reasoning that pursuant to *Brendlin v. California*, 551 U.S. 249, 251 (2007), Stark was seized within the meaning of the Fourth Amendment when the police conducted a traffic stop and thus had standing to challenge the constitutionality of said stop. *Id.*; *see also United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)(explaining that a defendant lacking the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.)

### Request under *Franks v. Delaware*

Briefly, I denied from the bench Lopategui's request for a hearing under *Franks v. Delaware* because I found, as previously stated, that he lacked standing to challenge the search that was conducted by the PRPB officers after obtaining the search warrant. I reaffirm here my decision that no *Franks* hearing was warranted. *See United States v. Torres*, 188 F. Supp. 2d 155, 158 (D.P.R. 2002)(finding that a defendant lacked standing

to request a hearing under *Franks v. Delaware* because he failed to prove a reasonable expectation of privacy in the place that was searched).

### *Traffic Stop*

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV.  There is no question that a seizure occurs "when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011)(*quoting Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).  And for several decades now, the Supreme Court has held that the stop of a motor vehicle due to a traffic violation constitutes a Fourth Amendment seizure. *Delaware v. Prouse*, 440 U.S. 648, 653 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).  As such, said seizure must be supported by reasonable suspicion that a traffic violation was committed. *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009)(*citing Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)). "When an unconstitutional seizure occurs, courts enforce the Fourth Amendment's proscription by excluding evidence obtained during said seizure." *United States v. Howard*, 66 F.4th 33, 41 (1st Cir. 2023)(*citing Camacho*, 661 F.3d at 724).

Moreover, once a police officer stops a vehicle, "the tolerable duration of police inquiries . . . is determined by the seizure's mission--to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 353, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)(cleaned up).  In carrying out the mission of the stop, an officer is permitted to undertake those "ordinary inquiries incident to [the traffic] stop." *Id.* at 355 (*quoting Illinois v. Caballes*, 543 U.S. 405, 408,

125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)).  Valid inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (*citing Delaware v. Prouse*, 440 U.S. at 658-660). "Authority for the seizure thus ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354 (*citing United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)). Put differently, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (*quoting Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)).

Indeed, the actions undertaken by an officer pursuant to a traffic stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008)(*quoting United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)).  In other words, "while an officer's actions must bear some relation to the purpose of the original stop, [officers may shift their] focus and increase the scope of [the] investigation by degrees if [their] suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

In this case, it is undisputed that the initial traffic stop was justified due to traffic violations.  Lopategui has not argued that the infractions did not occur.  He was driving at 75 miles per hour in a zone where the speed limit was 55 miles.  He was changing lanes negligently and without using turn signals. At that point, agents Mejia and Rivera-Rivera had more than ample justification to stop the car. Again, Lopategui does not contest that the initial intervention was lawful. The crux of his argument is that the seizure, while

18

justified at its inception, was unreasonably prolonged. Therefore, it is important to establish the timeframe.

As stated before, a reasonable estimate puts the initial intervention happening between 9:13 a.m. and 9:19 a.m. Agent Mejia testified that the car was stopped at approximately 9:20 a.m. Cellphone location data as well as the tickets issued corroborate this estimate. For instance, the first ticket was issued a 9:20 a.m. The last ticket was issued at 9:33 a.m. At some point after 9:33 a.m., Lopategui stepped out of his vehicle for the first time and was arrested shortly thereafter.  Between 9:19 a.m. and 9:39 a.m., the phone location data remained static. This establishes that the pre-arrest detention lasted until sometime before 9:39 a.m.

Against this backdrop, the main question for me to decide is whether the seizure was prolonged beyond what was necessary to accomplish its mission. Lopategui would answer the question in the affirmative because he argues that the mission of the stop was to issue traffic tickets and agent Mejia lacked reasonable suspicion to further extend the stop. In so arguing, the defendant maintains that agent Mejia lied about perceiving a strong odor of marijuana; that her focus was the purse that she observed in plain view and wanted Lopategui to show her the contents of.

The government for its part responds that the traffic stop was not unlawfully extended.  The United States contends that from inception to arrest, the traffic stop took approximately 22 minutes. Even if extended, the United States argues, agent Mejia had probable cause, or at least reasonable suspicion, to continue her investigation.  After all, she smelled marijuana, observed in plain view a police uniform hat, and the defendant

refused to cooperate with the investigation. The government also represents that agent Mejia had authority to arrest Lopategui for his traffic violations.[4]

I find that agent Mejia had reasonable suspicion to investigate further. At the hearing I was able to observe her demeanor.  She testified confidently, consistently, and thus, credibly, that she detected a strong odor of marijuana immediately upon approaching the vehicle driven by Mr. Lopategui.  In addition, she observed a police hat in plain view (a fact that has not been disputed by the defendant).  In that sense, her actions in seeking to investigate further were permissible for she had a reasonable basis to suspect criminal activity at that point. *See United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004)(the reasonableness of an officer's actions after an initial stop depend on what the officer knows or has reason to believe and how events unfold).

Agent Mejia requested Lopategui to consent to a search and he refused.  This was his right; and contrary to the government's suggestion, I do not factor said refusal at all in my analysis of whether the agent had reasonable suspicion. Lopategui's refusal, however, informs what the agent did next, which was explaining the procedure to request a search warrant.  The first step was to request a K9.  The evidence in the record shows

_____

[4] I am not so sure.  The government filed a motion *in limine* (Docket No. 89), asking the Court to take judicial notice of Puerto Rico Act 22 for the proposition that some of the traffic violations incurred by Mr. Lopategui were offenses for which he could be arrested. (Docket No. 99 at 3).  It appears that the government included a version of Act 22 that is not the most current version of the law.  The government specifically quoted 9 P.R. Laws Ann. § 5044(r) which appears to state that someone driving a motor vehicle with a suspended, revoked, or expired license incurs in a felony. (Docket No. 89-2). The current version of section 5044 does not have a subsection (r).  If the government meant to cite 9 P.R. Laws Ann. § 5048(r), such subsection makes clear that the offense, at least currently, is a misdemeanor. Be that as it may, Mr. Lopategui was not cited for a violation to sections 5044 or 5048.  And even assuming that the agent could effectuate an arrest for any of the traffic violations under Rule 11 of the Puerto Rico Rules of Criminal Procedure, the record is clear that the agent in this case decided to only issue tickets for the infractions.

that the K9 was requested at approximately 9:23 a.m., that is, within minutes of the initial interaction.  This gives credence to the testimony of agent Mejia that she did, in fact, smell marijuana.  Otherwise, it would not make sense that she is requesting her partner to call for a drug K9 within minutes of the traffic stop, if the only thing that raised her suspicion was the purse-style bag, as the defendant claims.  Second, depending on the outcome of the dog sniff, agent Mejia was prepared to apply for a search warrant. And while she waited for the K9, the evidence presented at the hearing demonstrates that she wrapped up the process of issuing the traffic tickets.  These actions were reasonable under the circumstances, and responsive to the events as they unfolded. *Chhien*, 266 F.3d at 6 (explaining that in the traffic stop context, the reasonable suspicion analysis includes a determination of whether the officer's actions "were fairly responsive to the emerging tableau.").

To be sure, a significant number of cases hold that perceiving the odor of marijuana coming from inside a vehicle is sufficient cause to warrant the extension of a traffic stop, even to search without more. For instance, in the First Circuit, the matter has long been settled that "when a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." *United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996*); see also United States v. Taylor*, 162 F.3d 12, 20 (1st Cir. 1998); *United States v. Hernandez*, Crim. No. 18-718 (ADC), 2020 WL 855373, 2020 U.S. Dist. LEXIS 30434 (D.P.R. Feb. 20, 2020); *United States v. Nieves*, 256 F. Supp. 3d 133, 137 (D.P.R. 2017); *United States*

*v. Santiago-Ramos*, 991 F. Supp. 2d 318 (D.P.R. 2014);  *United States v. Rivera*, 152 F. Supp. 2d 61, 66 (D. Mass. 2001).

The advent of medicinal marijuana and decriminalization has not altered the relevant constitutional analysis in any significant way. *See United States v. Sanders*, 248 F. Supp. 3d 339, 346 (D.R.I. 2017)(rejecting the argument that courts should not consider the odor of marijuana in the reasonable suspicion analysis because Rhode Island decriminalized the possession of one ounce or less of marijuana.); *United States v. Angrand*, No. 22-cr-20558-KMM, 2023 WL 6554293, 2023 U.S. Dist. LEXIS 166538 at*17-18 (S.D. Fla. Aug. 29, 2023)(smell of marijuana provided sufficient probable cause regardless of whether the smell of marijuana is indistinguishable from that of hemp, a legal substance); *United States v. Jeton E. Young*, 2023 U.S. Dist. LEXIS at *28 (E.D. Wis. Oct. 20, 2023)(rejecting argument that smell of marijuana cannot establish probable cause because the smell could have been legal marijuana or hemp). *But see United States v. Pavao*, 22-CR-00034-MSM-PAS, 2023 WL 3934555, 2023 U.S. Dist. LEXIS 100590 at *9 (D.R.I. June 9, 2023)(finding that the smell of burnt marijuana does not establish reasonable suspicion that criminal activity is afoot because it does not indicate that an unlawful amount was possessed.)

I also note that the fact that a large quantity of marijuana and a blunt cigarette were subsequently found in the car lends credibility to agent Mejia's testimony. Lopategui's point that the marijuana was found in the trunk and inside a bag, as opposed to the way it was displayed in Ex. 13, is not completely without merit. But it does not refute the claim that such large amount "could emit a strong odor." (Tr. 175). *See United States v. Luna-Ilarraza*, Crim. No. 07-041 (JAG), 2007 WL 4212342, 2007 U.S. Dist.

LEXIS 86955 at *13 (D.P.R. Nov. 27, 2007)(adopting credibility determination of a magistrate judge about agents that testified about odor of marijuana emanating from car where marijuana was subsequently found inside trunk); *see also United States v. Conway*, No. 17-43-DLB-CJS, 2018 U.S. Dist. LEXIS at *22 (E.D. Ky. June 4, 2018)("Moreover, the officers did find marijuana in the vehicle, further supporting their statements."); *United States v. Colon*, 2011 U.S. Dist. LEXIS 14106 (S.D.N.Y. Feb. 8, 2011)(the fact that loose raw marijuana was ultimately found lends credibility to the officer's testimony that he smelled marijuana).

      Further, after making my determination to credit agent Mejia's testimony regarding the odor of marijuana, I must decline any invitation to speculate about the detectability of the marijuana in the trunk based on how it was packaged. No evidence was presented at the hearing as to this specific point. *See United States v. Smith*, 596 Fed. Appx. 804, 807 (11th Cir. 2015)(refusing to disturb credibility determination even if the appellate panel thought it was unlikely for the odor of marijuana in the trunk to be detectable from outside the car).

      Lastly, the testimonies of attorney Freire-Medina and officer Rivera-Rivera do not alter my conclusions regarding agent Mejia's credibility. While I do not have any reason to doubt attorney Freire-Medina's testimony that in the brief conversation he had with agent Mejia, she only mentioned the purse-style bag, that does not mean she did not perceive odor of marijuana emanating from the car. Agent Rivera-Rivera's testimony that he himself did not smell marijuana, deserves less credibility because his testimony was equivocal, as he struggled to remember certain details about the intervention. He was not sure about the time of the intervention limiting himself to say that it was between

9:00 a.m. and 9:30 a.m.  He also admitted he could have made a mistake about the valid status of Mr. Lopategui's driver's license.[5]  This is understandable due to the passage of time, the fact that he was only providing back-up during the intervention, and the sheer volume of car stops that he conducts on a given day.  Ultimately, he testified that he called for a controlled substances K9 at the request of agent Mejia and acknowledged that the marijuana subsequently found in the trunk could emit a strong odor.

Taking into consideration the totality of the circumstances, agent Mejia had reasonable suspicion (even probable cause) to increase the scope of her investigation beyond the purpose of the original detention.  The presence of a police uniform hat as well as the strong odor of marijuana, supplied the necessary basis to reasonably suspect that criminal conduct was afoot.  Instead of immediately searching the car, she requested a K9 to either confirm or dispel her suspicion. In the process, she discovered in plain view evidence of a crime that gave her probable cause to arrest.  At that point, she could have searched the vehicle incident to the arrest.  Instead, she sealed the car and requested a search warrant.  Suppression is not warranted under these circumstances.

***Spoliation***

Mr. Lopategui has abandoned this argument.  In fact, I was expecting that a significant portion of the evidentiary hearing was going to be consumed with admitting

---

[5] We know for a fact that officer Rivera-Rivera was mistaken in his belief that the driver's license of Lopategui was not expired.  He also mistakenly thought that Mr. Lopategui produced his driver's license in physical card format.  (Tr. 161.)

into evidence and reviewing body-cam videos. Neither the government nor the defendant present body-cam videos or still images.  No argument was put forth at the hearing or in post-hearing memoranda as to this issue.  This claim is thus waived. *United States v. Zanino*, 895 F.2d 1, 17 (1st Cir. 1990)("[I]ssues adverted in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Even if sufficiently developed, the claim would necessarily fail on the merits. Mr. Lopategui has not established (1) that the government failed to preserve relevant body-cam videos; (2) that it did so in bad faith; (3) that any videos possessed an apparently exculpatory value; or (4) that they constitute evidence that is irreplaceable. *United States v. Femia*, 9 F.3d 990 (1st Cir. 1993); *see also United States v. Berroa-De La Cruz*, 556 F. Supp. 3d 56, 60-63 (D.P.R. 2021); *United States v. Cruz-Osorio*, Crim. No. 22-285 (RAM), 2023 WL 7019422, 2023 U.S. Dist. LEXIS at *16-20 (D.P.R. Oct. 25, 2023).

## CONCLUSION

In view of the above, I recommend that Mr. Lopategui's motions to suppress be DENIED.  The motion to dismiss should also be DENIED.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 14th day of May, 2024.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE
